**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UTAH TRAILWAYS CHARTER BUS COMPANY LLC, *et al.*,<br><br>              Plaintiffs,<br><br>      v.<br><br>SMALL BUSINESS ADMINISTRATION, *et al.*,<br><br>              Defendants. | Case No. 1:24-cv-01659 (TNM) |

**PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND............................................................ 3

    I.      Section 7(a) of the Small Business Act................................................................3

    II.     The CARES Act and the PPP ............................................................................4

    III.   IFR 7 And The Single Corporate Group Rule .....................................................6

    IV.  SBA Guidance on Applicable Rules....................................................................7

FACTUAL AND PROCEDURAL BACKGROUND.................................................................. 8

    I.      The Plaintiffs.......................................................................................................8

    II.     Procedural History of Forgiveness Denials .......................................................11

          A.     First Round (January–May 2022) ..............................................................11

          B.     Second Round (August–November 2022) ..................................................13

          C.     Third Round (August–November 2023)......................................................14

          D.     OHA Appeal (November 2023–May 2024) ...............................................14

          E.     APA Litigation...........................................................................................15

LEGAL STANDARD............................................................................................................ 15

ARGUMENT....................................................................................................................... 17

    I.      Plaintiffs Are Entitled to Loan Forgiveness Because They Were Eligible
         Borrowers and the Agency Identified No Basis to Deny Forgiveness on the
         Merits. ................................................................................................................17

          A.     Each Plaintiff Satisfied the Statutory Criteria for a PPP Loan and for
                Loan Forgiveness. .....................................................................................17

          B.     The SBA Did Not Deny Forgiveness Based on Any Forgiveness-
                Specific Criterion. .....................................................................................18

           C.     The Agency's Sole Basis for Denial Was Its Interpretation and
                Application of IFR 7's Single Corporate Group Rule. ...........................19

i

II.     The SBA's Interpretation of IFR 7 Is Arbitrary, Capricious, and Contrary to Law (Count I). ...................................................................................20

     A.     The Plain Meaning of "Common Parent" Forecloses the SBA's Interpretation. ...............................................................................20

     B.     OHA's Contrary Reasoning Fails. ............................................................22

     C.     The Structure of IFR 7 Confirms That the SBA's Interpretation Is Incorrect. ...................................................................................23

     D.     The SBA's Shifting Reasoning Is Itself Arbitrary and Capricious. ...........24

     E.     The SBA's Interpretation Must Be Set Aside. ...........................................25

III.     The SBA's Retroactive Application of IFR 7 Was Unlawful (Counts II and III). .........................................................................................26

     A.     IFR 7 Imposed a New Limitation That Did Not Exist When Plaintiffs Applied For the Loans. ..............................................................26

     B.     The SBA Lacked Authority to Apply IFR 7 Retroactively, and Its Application Has an Impermissible Retroactive Effect. ..............................27

     C.     IFR 7's Own Terms Prohibit Retroactive Application. ............................31

     D.     OHA's Attempts to Avoid the Retroactivity Problem Fail. ......................32

IV.     IFR 7 Exceeds the SBA's Statutory Authority and Is Contrary to Law (Count IV). ..................................................................................35

     A.     The CARES Act Establishes a Borrower-Based Framework that Limits the SBA's Discretion. ....................................................................35

     B.     Even Where Courts Have Upheld the SBA's Authority to Adopt a Corporate-Group Cap, They Require Lawful Application of that Rule. ...................................................................................37

     C.     The SBA's Application of IFR 7 Here Exceeds Any Permissible Authority. ...............................................................................39

V.     Plaintiffs Are Entitled to Declaratory and Injunctive Relief (Count V). ...............39

VI.     The APA Waives Sovereign Immunity for Plaintiffs' Claims. ...........................41

CONCLUSION ...................................................................................... 42

CERTIFICATE OF SERVICE .................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*35 State Street Hotel Partners, LLC v. Loeffler*,
No. 24-747 (JDB), 2025 WL 870535 (D.D.C. Mar. 20, 2025)................................3, 19, 37

*AARP v. EEOC*,
292 F. Supp. 3d 238 (D.D.C. 2017) .................................................................................39

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005) ................................................................................. 39-40

*Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
212 F.3d 1301 (D.C. Cir. 2000) .......................................................................................25

*Am. Biosciences, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ..................................................................................15, 16

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724, 735 (2022).................................................................................................20

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
64 F.4th 1354 (D.C. Cir. 2023) .......................................................................................41

*Ascendium Educ. Sols., Inc. v. Cardona*,
78 F.4th 470 (D.C. Cir. 2023) .........................................................................................20

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)..................................................................................26, 27, 28, 33

*Bowen v. Massachusetts*,
487 U.S. 879 (1988).........................................................................................................41

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).........................................................................................................16

*Corley v. United States*,
556 U.S. 303 (2009).........................................................................................................32

*Dep't of Com. v. New York*,
588 U.S. 752 (2019).........................................................................................................24

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).............................................................................................25, 33, 34

*Env't Def. Fund v. EPA*,
    124 F.4th 1 (D.C. Cir. 2024).................................................................................16

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).................................................................................33, 34

*Fina Oil & Chem. Co. v. Norton*,
    332 F.3d 672 (D.C. Cir. 2003).................................................................................23

*Fla. Power & Light Co. v. Lorian*,
    470 U.S. 729 (1985).................................................................................16

*FTC v. Tarriff*,
    584 F.3d 1088 (D.C. Cir. 2009).................................................................................20

*Kisor v. Wilkie*,
    588 U.S. 558 (2019).................................................................................20

*Ky. Mun. Energy Agency v. FERC*,
    45 F.4th 162 (D.C. Cir. 2022).................................................................................40

*\*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)................................................................................. *passim*

*Long Island Power Auth. v. FERC*,
    27 F.4th 705 (D.C. Cir. 2022).................................................................................40

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024).................................................................................16, 36

*MCI Worldcom Network Servs., Inc. v. FCC*,
    274 F.3d 542 (D.C. Cir. 2001).................................................................................16

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).................................................................................16, 33, 37, 38

*N.Y. Stock Exch. LLC v. SEC*,
    962 F.3d 541 (D.C. Cir. 2020).................................................................................36

*Nat'l Mining Ass'n v. U.S. Dep't of Interior*,
    177 F.3d 1 (D.C. Cir. 1999).................................................................................28-29

*Pub. Utils. Comm'n of Cal. v. FERC*,
    988 F.2d 154 (D.C. Cir. 1993).................................................................................30, 34

iv

*Ragsdale v. Wolverine World Wide, Inc.*,
    535 U.S. 81 (2002).................................................................................................36

*SBA v. McClellan*,
    364 U.S. 446 (1960)...................................................................................................3

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943).................................................................................................24

*Springfield Hosp., Inc. v. Guzman*,
    28 F.4th 403 (2d Cir. 2022) ...................................................................................4, 5

*Tierney v. Schweiker*,
    718 F.2d 449 (D.C. Cir. 1983).............................................................................40, 41

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006)................................................................................41

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001).................................................................................................24

*United States v. Bestfoods*,
    524 U.S. 51 (1998).................................................................................................21

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)...............................................................................................37

*Williams v. Taylor*,
    529 U.S. 420 (2000).........................................................................................20, 21

## STATUTES

5 U.S.C. § 702...............................................................................................................41

5 U.S.C. § 706.................................................................................................16, 31, 39

15 U.S.C. § 631................................................................................................................3

15 U.S.C. § 632...........................................................................................................4, 10

15 U.S.C. § 634..............................................................................................................28

15 U.S.C. § 636.................................................................................................... *passim*

15 U.S.C. § 636m...............................................................................................5, 18, 35, 36

15 U.S.C. § 9012.................................................................................................................5, 27, 30

26 U.S.C. § 59.................................................................................................................................21

26 U.S.C. § 243...............................................................................................................................21

26 U.S.C. § 409...............................................................................................................................21

26 U.S.C. § 542...............................................................................................................................21

26 U.S.C. § 843...............................................................................................................................21

26 U.S.C. § 864...............................................................................................................................21

26 U.S.C. § 1563.............................................................................................................................21

26 U.S.C. § 7701.............................................................................................................................21

28 U.S.C. § 2201.............................................................................................................................40

## REGULATIONS

13 C.F.R. § 120.100......................................................................................................................3, 4

13 C.F.R. § 121.101..........................................................................................................................4

13 C.F.R. § 121.103..........................................................................................................................4

13 C.F.R. § 121.201.......................................................................................................................4, 5

13 C.F.R. § 121.301......................................................................................................................4, 17

31 C.F.R. § 148.2(c).........................................................................................................................

48 C.F.R. § 4.901............................................................................................................................21

## RULES

Fed. R. Civ. P. 8.............................................................................................................................16

Fed. R. Civ. P. 56...........................................................................................................................15

Fed. R. Evid. 201............................................................................................................................16

vi

## OTHER AUTHORITIES

Business Loan Program Temporary Changes;
Paycheck Protection Program–Requirements–Corporate Groups and
Non-Bank and Non-Insured Depository Institution Lenders,
    85 Fed. Reg. 26,324 (May 4, 2020) ........................................................................ *passim*

Business Loan Program Temporary Changes; Paycheck Protection Program,
    85 Fed. Reg. 20,811 (Apr. 15, 2020) ...............................................................................6, 26

Business Loan Program Temporary Changes;
Paycheck Protection Program–Requirements–Loan Forgiveness,
    85 Fed. Reg. 33,004 (June 1, 2020) .............................................................8, 30, 32, 33, 34

Business Loan Program Temporary Changes;
Paycheck Protection Program–Loan Forgiveness Requirements and
Loan Review Procedures as Amended by Economic Aid Act,
    86 Fed. Reg. 8,283 (Feb. 5, 2021) ...............................................................8, 30, 32, 33, 34

Business Loan Program Temporary Changes;
Paycheck Protection Program–Revisions to Loan Forgiveness and
Loan Review Procedures Interim Final Rules,
    85 Fed. Reg. 38,304 (June 26, 2020) .......................................................................8, 32, 33

Coronavirus Aid, Relief, and Economic Security Act,
    Pub. L. No. 116-136, 134 Stat. 281 (2020)...........................................................................4

*Joint Statement by Treasury Secretary Steven T. Mnuchin and SBA*
*Administrator Jovita Carranza on the Resumption of the Paycheck Protection Program*
(Apr. 24, 2020), https://home.treasury.gov/news/press-releases/sm988 .........................................6

Paycheck Protection Program and Health Care Enhancement Act,
    Pub. L. No. 116-139, 134 Stat. 620 (2020)...........................................................................6

Plaintiffs MVFTWO LLC, MVFTWO SERIES THREE LLC, TROPICALSMOOTHIEAZ2 L.L.C., TROPICALSMOOTHIEAZ3 L.L.C., VERITASFAYTHE INC., and VERITASFAYTHESEVEN LLC (collectively, the "**Non-Debtor Plaintiffs**") and Utah Trailways Charter Bus Company LLC ("**Utah Trailways**"), Johnny Z Casino Operator LLC, Gold Country Operator LLC, Maverick Kirkland LLC, Maverick Kirkland II LLC, Maverick Lakewood LLC, NG Washington III LLC, Red Garter Operator LLC, and Wendover Nugget Operator LLC (collectively, the "**Debtor Plaintiffs**"), by and through their undersigned counsel, hereby submit this consolidated motion for summary judgment as follows:

## INTRODUCTION

Congress created the Paycheck Protection Program ("**PPP**") to provide quick assistance to qualifying businesses during a national emergency. Congress set the program's eligibility rules, set the maximum loan amount for each business, and directed the Small Business Administration ("**SBA**") to implement the program consistently with that statutory design. After the Plaintiffs had applied for PPP loans, the SBA published Interim Final Rule 7 ("**IFR 7**") on May 4, 2020. IFR 7 stated expressly that it would not have retroactive effect, which was consistent with contemporaneous written guidance from the SBA that PPP applicants could rely on the guidance and rules in effect at the time of their application. Years later, the SBA denied forgiveness of the Plaintiffs' loans by interpreting IFR 7's language contrary to its plain meaning and by applying IFR 7 retroactively. The Office of Hearings and Appeals ("**OHA**") then affirmed those flawed denials. The Administrative Procedure Act ("**APA**") does not permit this result.

The SBA's decision fails at every level. First, the agency's interpretation of IFR 7 is contrary to plain meaning of its text. The rule uses the term "common parent," not "common owner," "controlling person," or "affiliate." In the context of a corporate group or business

1

transactions, "common parent" is not ambiguous. It means another corporate entity, not an individual investor or owner, that is the "parent" of the corporate entities at issue. As discussed below, various federal laws or regulations use "common parent" solely in reference to other corporate entities. The SBA's interpretation seems to be without any precedent or comparable usage across federal laws or regulations.

More broadly, "common parent" is simply not one of the many options to describe the relationship between natural persons and their affiliated businesses. For example, Elon Musk might be described as the founder, controlling shareholder, or even as a common owner, of his various companies such as Tesla, SpaceX, Neuralink, or xAI. But it would be strikingly odd to describe him as their "common parent." Indeed, such usage is unheard of – despite millions of articles or other writeups about Elon Musk and his companies, a diligent search has found *none* that refer to Mr. Musk as the "common parent" of such companies.

Second, the SBA applied IFR 7 retroactively. Each Plaintiff applied for its PPP loan before IFR 7 was published on May 4, 2020. Prior to those applications, the SBA had issued written public guidance *at least eight times during April 2020* that applicants could rely on the guidance or rules in effect at the time of application. Consistent with this guidance, IFR 7 expressly provides that it has "no preemptive or retroactive effect." Then, although Congress did not provide the SBA authority under which to make rules for the PPP program retroactive, and despite its prior written guidance and the IFR 7 text expressly disclaiming retroactivity or preemptive effect, the SBA nonetheless used IFR 7 to conclude that Plaintiffs were never eligible borrowers and to deny loan forgiveness. The agency's attempt to recharacterize this as a forgiveness-stage determination cannot obscure the reality that it applied a new rule to prior conduct.

Third, IFR 7 itself exceeds the SBA's statutory authority insofar as the SBA used it to deny loan forgiveness to otherwise eligible borrowers without providing a reasoned explanation for why a violation of the single corporate group cap renders a business ineligible for forgiveness. The SBA's failure to connect the dots between a violation of the Single Corporate Group ("**SCG**") Rule and a denial of forgiveness was arbitrary and capricious. *See 35 State Street Hotel Partners, LLC v. Loeffler*, No. 24-747 (JDB), 2025 WL 870535 (D.D.C. Mar. 20, 2025).

The material facts are not subject to genuine dispute. The governing texts are not ambiguous. The record and the final OHA decision is fixed. What remains is a legal question, and on the facts and record before the Court, summary judgment for Plaintiffs on all counts is warranted.

## STATUTORY AND REGULATORY BACKGROUND

### I. Section 7(a) of the Small Business Act

"The Small Business Act of 1953 created the Small Business Administration to 'aid, counsel, assist, and protect insofar as is possible the interests of small-business concerns in order to preserve free competitive enterprise . . . and to maintain and strengthen the overall economy of the Nation.'" *SBA v. McClellan*, 364 U.S. 446, 447 (1960) (quoting 15 U.S.C. § 631(a)). One of the "extraordinarily broad powers" the Small Business Act gives to the SBA is to lend money. *Id.* That power is granted in part by § 7(a) of the Small Business Act, which provides that SBA "is empowered to the extent and in such amounts as provided in advance in appropriation Acts . . . to make loans to any qualified small business concern." 15 U.S.C. § 636(a).

Under the SBA's regulations, a business is eligible for a § 7(a) loan only if, among other requirements, it is "small under the size requirement of part 121." 13 C.F.R. § 120.100(d). Part

3

121 explains that size requirements are based on either number of employees or annual receipts and vary by industry. *See* 13 C.F.R. § 121.201; *id.* § 121.101(a).

Part 121 also contains the "affiliation rules." In certain circumstances, the SBA takes into account "other entities ('Affiliates') owned by the applicant or an owner of the applicant" to "determin[e] the size of the applicant." 13 C.F.R. § 121.301; *id.* § 120.100(d). Under the SBA's affiliation rules, businesses in the same industry are affiliated if one individual owns more than 50 percent of each business. *See* 13 C.F.R. § 121.301(f)(1)(iii); *id.* § 121.103(a)(2).

For § 7(a) loans, the affiliation rules mean an entity is eligible if it does "not exceed the size standard" for its industry either alone or when "combined with its affiliates." 13 C.F.R. §§ 121.301(a)(1)–(2). If a business fails either requirement, it can still be eligible if, "[i]ncluding its affiliates," it has a "tangible net worth" of $15 million or less and an "average net income" of $5 million or less over the past two fiscal years. 15 U.S.C. § 632(a)(5).

## II.     The CARES Act and the PPP

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) (the "**CARES Act**") "to, in part, alleviate the pandemic's substantial economic effects on small businesses." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 409 (2d Cir. 2022). Section 1102 of the CARES Act established the PPP to "provid[e] small businesses with the funds necessary to meet their payroll and operating expenses and therefore keep workers employed." *Id.* (citing 15 U.S.C. § 636(a)(36)).

The CARES Act established the PPP as a temporary amendment to § 7(a) of the Small Business Act. *See Springfield Hosp.*, 28 F.4th at 409-10; 15 U.S.C. § 636(a)(36); *see also id.* § 636(a)(36)(B) ("Except as otherwise provided . . . [SBA] may guarantee covered loans under the same terms, conditions, and processes as a loan made under" § 7(a)). Broadly, the PPP altered

4

SBA's standard § 7(a) loan program in two ways: 1) it expanded the pool of eligible loan recipients and 2) it allowed borrowers to apply for, and the SBA to grant, loan forgiveness. *See Springfield Hosp.*, 28 F.4th at 409–10; 15 U.S.C. § 636(a)(36)(D); *id.* § 636m(b).

With the PPP, Congress expanded the availability of loans by relaxing or waiving certain § 7(a) eligibility criteria, including criteria related to size or affiliation. "[A]ny business concern" was eligible for a "covered loan" if it had not more than 500 employees or the applicable industry employee size standard, whichever was larger. 15 U.S.C. §§ 636(a)(36)(D)(i)(I)–(II). In addition, Congress expressly provided that "the provisions applicable to affiliations under [13 C.F.R. § 121.103], or any successor regulation, [wer]e waived with respect to eligibility for a covered loan for" business concern[s] . . . assigned a North American Industry Classification System code beginning with 72" (the "**Affiliation Waiver**"). 15 U.S.C. § 636(a)(36)(D)(iv)(I). Businesses with North American Industry Classification System ("**NAICS**") codes starting with 72 are in the Accommodation and Food Services industries. 13 C.F.R. § 121.201. All restaurants have NAICS codes beginning with "72" as do certain other businesses, including hotels and casino hotels. *Id.*

The statute also set a maximum loan amount: each entity's maximum was a function of its average monthly payroll costs, multiplied by 2.5, but in no event could the amount exceed $10 million. 15 U.S.C. § 636(a)(36)(E). In addition, the CARES Act made a "covered loan" eligible for forgiveness if the loan proceeds were used appropriately, in particular to satisfy payroll costs or other eligible costs. 15 U.S.C. §§ 636m(b), 636m(d)(8).

Congress mandated that SBA "issue regulations to carry out" the PPP "[n]ot later than 15 days" after the Act's enactment "without regard to the notice requirements" under the APA. 15 U.S.C. § 9012. The resulting regulations largely "streamlin[ed] the requirements of the regular

7(a) loan program." *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,811–12, 20,815 (Apr. 15, 2020).

Many businesses quickly applied for PPP loans and the program's initial appropriation of $349 billion under the CARES Act was exhausted on or around April 16, 2020.  On April 24, 2020, Congress enacted the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. No. 116-139, 134 Stat. 620 (2020)) that included a new appropriation of $310 billion for PPP loans.

Notably, although the initial appropriation for PPP loans had been exhausted, Congress made no attempt to restrict PPP loan eligibility in this new appropriation. Rather, the expressed purpose was to ensure all eligible borrowers could access to such loans, and both the Department of the Treasury and the SBA expressly urged all eligible borrowers to apply.[1] This second appropriation was sufficient to fund all PPP loans disbursed between April 27, 2020 and August 8, 2020, and $146.5 billion of excess funds were rescinded by Congress in the Consolidated Appropriations Act enacted on December 27, 2020 (Pub. L. No. 116-260).

## III.    IFR 7 And The Single Corporate Group Rule

On May 4, 2020, the SBA published IFR 7, which introduced what became known as the "Single Corporate Group Rule" or "SCG Rule."[2] Business Loan Program Temporary Changes; Paycheck Protection Program–Requirements–Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders, 85 Fed. Reg. 26,324, 26,324–25 (May 4, 2020). This rule provided

---

[1]  *See, e.g.*, *Joint Statement by Treasury Secretary Steven T. Mnuchin and SBA Administrator Jovita Carranza on the Resumption of the Paycheck Protection Program* (Apr. 24, 2020), https://home.treasury.gov/news/press-releases/sm988 (noting that "[a]ll eligible borrowers who need these funds should work with an approved lender to apply").

[2] The SCG Rule constitutes section III(1) of IFR 7.  As used herein, the terms "SCG Rule" and "IFR 7" are synonymous.

that "businesses that are part of a single corporate group shall in no event receive more than $20,000,000 of PPP loans in the aggregate." *Id.* at 26,325. A "single corporate group" was described as businesses that "are majority owned, directly or indirectly, by a common parent." *Id.* The term "common parent" is not defined, explained or otherwise used in the SCG Rule.

IFR 7 further provided that all businesses, including those to which the Affiliation Waiver applied, were subject to the SCG Rule. *See id.* ("Business are subject to this limitation even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act . . .")

Upon its publication on May 4, 2020, the SCG Rule was "immediately effective with respect to any loan that has not yet been fully disbursed as of April 30, 2020." *Id.* IFR 7 expressly provided that it had "no preemptive or retroactive effect." *Id.* at 26,326.

Although Congress had only just enacted the second appropriation for PPP loans, without any amendment of the Affiliation Waiver or other borrower eligibility requirements, the SBA stated that IFR 7 was intended "[t]o preserve the limited resources available to the PPP program." *Id.* at 26,324–25.

## IV.    SBA Guidance on Applicable Rules

The SBA repeatedly issued written statements confirming that PPP applicants could rely on the guidance and rules in effect at the time of their loan application. On April 6, 2020, SBA published the *Paycheck Protection Program Loans Frequently Asked Questions* (the "**FAQ**"),[3] which included the following statements:

- "Borrowers and lenders may rely on the guidance provided in this document . . ." (FAQ at 1); and

---

[3] All versions of the FAQ are available from the SBA at https://www.sba.gov/document/support-faq-ppp-borrowers-lenders. The FAQ as of July 29, 2021 (version 22) is in the Administrative Record at SBA000086–000115.

- "Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application." (FAQ at 6 (Answer 17)).

The SBA published the FAQ and seven updates during April 2020. Each of those publications maintained these statements without revision, as did subsequent versions of the FAQ.

Subsequent interim final rules applicable to PPP loans further reinforced this principle that applicants could rely on the rules and guidance in effect at the time of the loan application. The SBA stated that "[i]f SBA determines in the course of its review that the borrower was ineligible for the PPP loan based on the provisions of the CARES Act, SBA rules or guidance available at the time of the borrower's loan application . . . the loan will not be eligible for loan forgiveness." Business Loan Program Temporary Changes; Paycheck Protection Program–Requirements–Loam Forgiveness, 85 Fed. Reg. 33,004, 33,005 (June 1, 2020); *see also* Business Loan Program Temporary Changes; Paycheck Protection Program–Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act, 86 Fed. Reg. 8,283, 8,288 (Feb. 5, 2021); Business Loan Program Temporary Changes; Paycheck Protection Program–Revisions to Loan Forgiveness and Loan Review Procedures Interim Final Rules, 85 Fed. Reg. 38,304, 38,306 (June 26, 2020).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Plaintiffs

The Plaintiffs consist of multiple corporate groups as described in the Complaint or Administrative Record. *See, e.g.*, Compl. ¶¶ 69; SBA000116–000118; SBA000151–000153; SBA014108–014110.

8

Each of the Non-Debtor Plaintiffs is a corporate entity that operates a "Tropical Smoothie Cafe" restaurant in Las Vegas, Nevada or in Phoenix or Tempe, Arizona. Compl. ¶¶ 32-37. Each of the Non-Debtor Plaintiffs has an NAICS code beginning with "72." SBA001400- 001401.

Each of the Debtor Plaintiffs is a corporate entity that operates a casino or a casino-hotel at locations in Colorado, Washington, or in Elko or West Wendover, Nevada, other than Utah Trailways Charter Bus Company LLC, which is a charter bus company based in Utah. Compl. ¶¶ 23-31. Some of the Debtor Plaintiffs have an NAICS code beginning with "72" and others do not. SBA001400–001401.

Eric Persson is an individual (a natural person). *See* Compl. ¶¶ 7, 61, Answer ¶ 61; *see also, e.g.*, SBA000118; SBA000153; SBA014110.  Each of the Non-Debtor Plaintiffs is owned by Mr. Persson directly. No Debtor Plaintiff is owned directly by Mr. Persson. Rather, he indirectly holds all, or a majority of, the equity or member interests of the Debtor Plaintiffs through multiple and various parent companies that are not Plaintiffs. *See* Compl. Exh. 3. SBA000116–000118; SBA000151–000153; SBA014108–014110.

Each of the Debtor Plaintiffs is, together with certain of their affiliates that are not Plaintiffs, currently a debtor in Chapter 11 bankruptcy cases commenced on July 14, 2025 that are being jointly administered under Case No. 25-91091 in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Cases**").[4] The Debtor Plaintiffs are, with their affiliated debtors, obligors on a term loan credit facility with an outstanding principal amount in excess of $305 million that are secured by first priority security interests on substantially all assets

---

[4] For ease of reference, the docket of the Bankruptcy Cases, with full copies of all pleadings and orders therein, is publicly available, free of charge, on the website maintained by an agent appointed by the bankruptcy court at https://restructuring.ra.kroll.com/runitonetime/.

9

of the Debtor Plaintiffs and their co-obligors.[5] No Non-Debtor Plaintiff is an obligor on that credit facility or a debtor in the Bankruptcy Cases.[6]

Each Plaintiff was eligible to receive PPP loans, either because it was a hotel or restaurant that qualified for the Affiliation Waiver, or because it qualified for the alternative size standard.[7] Every Plaintiff applied for its PPP loan before IFR 7 was published on May 4, 2020. SBA022531.

The loan applications and amounts as to the Plaintiffs are as follows:

| Plaintiff | Date of Loan Application | Loan Amount | Date of Loan Disbursement |
|---|---|---|---|
| MVFTWO SERIES THREE | April 30, 2020 | $34,952.00 | May 1, 2020 |
| MVFTWO LLC | May 1, 2020 | $41,100.00 | May 5, 2020 |
| TROPICALSMOOTHIEAZ2 | May 1, 2020 | $35,992.00 | May 4, 2020 |
| TROPICALSMOOTHIEAZ3 | May 3, 2020 | $22,764.00 | May 4, 2020 |
| VERITASFAYTHE INC | May 3, 2020 | $44,507.00 | May 4, 2020 |
| VERITASFAYTHESEVEN LLC | April 30, 2020 | $30,420.38 | May 26, 2020 |
| Utah Trailways Charter Bus Company LLC | April 27, 2020 | $100,405.00 | May 5, 2020 |
| Maverick Kirkland II LLC | April 27, 2020 | $1,536,415.00 | May 2, 2020 |
| WENDOVER NUGGET OPERATOR LLC | April 27, 2020 | $1,545,851.00 | May 2, 2020 |
| NG Washington III LLC | April 27, 2020 | $1,183,708.00 | May 2, 2020 |
| Maverick Lakewood LLC | April 27, 2020 | $1,042,142.00 | May 2, 2020 |
| Maverick Kirkland LLC | April 27, 2020 | $685,829.00 | May 1, 2020 |
| Red Garter Operator LLC | April 27, 2020 | $566,972.00 | May 2, 2020 |
| Johnny Z Casino Operator LLC | April 27, 2020 | $443,205.00 | May 2, 2020 |

---

[5] *See, e.g.*, *Final Order (I) Authorizing Postpetition Financing and Use of Cash Collateral and (II) Granting Related Relief* [ECF 171] ¶ F(i)(b), (c), Case No. 25-90191 (ARP) (Bankr. S.D. Tex. Aug. 27, 2025).

[6] *See, e.g.*, *Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors; (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information; (III) Approving the Form and Manner of Notice of Commencement; and (IV) Granting Related Relief* [ECF 59], n.1, Exh. 1, Case No. 25-90191 (ARP) (Bankr. S.D. Tex. Aug. 27, 2025) (identifying all debtor entities).

[7] Under the alternative size standard, eligible PPP borrowers must have had (1) a maximum tangible net worth not exceeding $15 million, and (2) an average net income not exceeding $5 million after Federal income taxes (excluding any carry-over losses) for the two full fiscal years before the date of the loan application. 15 U.S.C. § 632(a)(5).

| Gold Country Operator LLC | April 27, 2020 | $426,718.00 | May 1, 2020 |

SBA002764–002765; SBA001399–001401.

In addition to the Plaintiffs, certain other entities that were held, directly or indirectly, by Mr. Persson, also applied and received PPP loans. All such PPP loans were applied for before May 4, 2020. The aggregate amount of all such PPP loans, inclusive of the PPP loans disbursed to the Plaintiffs, that were disbursed on or after May 4, 2020 and not forgiven is 1,067,879. SBA001399–001401.

## II.    Procedural History of Forgiveness Denials

Plaintiffs applied for forgiveness of their respective PPP loans between October 2020 and June 2021.[8] The procedural history that followed was prolonged and marked by the SBA's repeated changes in rationale.

### A.    First Round (January–May 2022)

Beginning in January 2022, the SBA denied Plaintiffs' forgiveness applications on multiple and inconsistent grounds. Some denials asserted that Plaintiffs' entities employed too many people and thus failed IFR 7(a) employee-based size standard and the SBA alternative size standard tests, completely ignoring the exemptions for restaurants and other NAICS codes beginning with "72" in the CARES Act.[9] Other denials asserted that all entities were in the "family of corporations" owned by Mr. Persson and had received more than $20 million in aggregate PPP loans.[10] The

---

[8]  SBA002471–002472;    SBA008959–008960;    SBA014809–014810;    SBA013666–013667; SBA013182–013183;    SBA006685–006686;    SBA010333–010334;    SBA012565–012566; SBA007754–007755;    SBA013580–013581;    SBA007094–007095;    SBA014229–014230; SBA014711–014712; SBA007534–007535.

[9]  SBA010333–010334;    SBA013182–013183;    SBA013580–013581;    SBA013666–013667; SBA014170–014171; SBA014711–014712; SBA014809–014810.

[10] SBA014415—014416; SBA008959–SBA008960; SBA002631–002632; SBA006685–006686; SBA013861–013862;    SBA012565–012566;    SBA007754–007755;    SBA006754–006755; SBA007094–007095; SBA014229–014230; SBA007534–007535.

denials were internally inconsistent: the SBA variously described Mr. Persson as an "individual," an "individual or estate," and a "family."[11] None of the first-round justifications referred to Mr. Persson as a "common parent."[12]

Before these initial denials in 2022, the SBA's own reviewer, Shirley Cole, confirmed in July 2021, after a thorough review that, as an example, Utah Trailways was "an eligible business" and that the "borrower has no affiliated businesses/meets SBA affiliation guidelines." SBA000201. Ms. Cole reviewed the payroll documentation, calculated the maximum loan amount at $104,365, reviewed the forgiveness documentation (including payroll costs of $439,307.95 during the covered period, lease costs of $37,080, and utility costs of $3,999.44), and concluded: "Recommendation is for Approval." *Id.* The lender, Lexicon Bank, independently reached the same conclusion: its "Lender Requested Forgiveness Amount" was $100,405.00 (the full loan amount), reflecting the lender's determination that Utah Trailways qualified for complete forgiveness. SBA000191. SBA ultimately denied the forgiveness application and did so for the other Plaintiffs' applications. *Id.* SBA contacted the lender U.S. National Bank, the lender for TROPICALSMOOTHIEAZ23, VERITASFAYTHE Inc. and some of the other Non-Debtor Plaintiffs, regarding its recommendations to deny their loan forgiveness applications. SBA007310–007313; SBA007517–007519. However, U.S. National Bank independently concluded that the "entities associated with Eric Persson meet with the affiliation

---

[11]    SBA012774-012775;  SBA014745–014746;  SBA006685–006686;  SBA007094–007095; SBA014229–014230; SBA014711–014712.

[12] *See* SBA002471–002472; SBA014415–014416; SBA001528–001529; SBA008959–008960; SBA012774–012775;    SBA014809–014810;    SBA002631–002632;    SBA013666–013667; SBA002787–00278;    SBA013182–013183;    SBA004672–004673;    SBA006685–006686; SBA012966–012967;    SBA010333–010334;    SBA013861–013862;    SBA012565–012566; SBA006835–006836;    SBA007754–007755;    SBA012366–012367;    SBA013580–013581; SBA006754–006755;       SBA007094–007095;    SBA014170–014171;    SBA014229–014230; SBA014711–014712; SBA007327–007328; SBA007534–007535; SBA014745–014746.

waiver criteria." SBA007310. U.S. National Bank also independently reached a conclusion granting Non-Debtor Plaintiff VERITASFAYTHE Inc. forgiveness for $44,507.00, the full loan amount, despite the recommendation from SBA to deny the loan forgiveness. SBA007315–007324. SBA ultimately denied the forgiveness application for TROPICALSMOOTHIEAZ23, VERITASFAYTHE Inc. and the other Non-Debtor Plaintiffs' applications. SBA007327–007329; SBA006754–006755;    SBA007080–007081;    SBA007094–007095;    SBA014229-014230; SBA007534-007535. as well as the applications for the Debtor Plaintiffs.

Rather than defend these denials, the SBA withdrew every decision and sought dismissal of all appeals from OHA. SBA000134–000139; SBA013492–013511; SBA014208–014214; SBA014267–014273;    SBA014718–14730;    SBA014792–014794;    SBA013627–013633; SBA014168–014169; SBA014227–014228.

### B.    Second Round (August–November 2022)

The SBA denied Plaintiffs' applications again on August 22, 2022, on the basis that the entities were owned by Mr. Persson's "corporate group."[13] This time, the denials stated that "Eric Persson is the indirect owner of those multiple entities; therefore, it is confirmed that Eric Persson is the majority owner and common parent of all entities via the direct or indirect ownership of all."[14] Plaintiffs timely appealed. SBA000140–000148.  Once again, the SBA withdrew these decisions and obtained dismissal of the appeals. SBA014143–014149; *see also* SBA014323–014331.

---

[13]  SBA001530–001531;  SBA008961–008962;  SBA014959–014960;  SBA013792–013793; SBA013319–013320;    SBA013104–013105;    SBA010335–010336;    SBA006837–006838; SBA007757–007758;    SBA013515–013516;    SBA013381–013382;    SBA007096–007097; SBA007196–007197; SBA007330–007331.
[14] *Id.*

### C.      Third Round (August–November 2023)

The SBA denied Plaintiffs' applications a third time on August 30, 2023.[15] The denial

stated that "Eric Persson [is the] common owner" of the entities and that "there is only one

Corporate Group consisting of Eric Persson due to his majority ownership in each business."[16]

Notably, the third-round denial used the phrase "common owner" rather than "common parent."

The phrase "common owner" does not appear in IFR 7.

Plaintiffs timely appealed the third-round denials to OHA on September 28, 2023, except

for VERITASFAYTHESEVEN LLC, which did not receive its denial until October 16, 2023, and

thus appealed on November 3, 2023. SBA001420–001430; SBA007532–007533.  In their appeals,

Plaintiffs raised three principal arguments: (1) IFR 7's "single corporate group" limitation did not

apply because an individual who exercises ownership over entities cannot be a "common parent"

of a "corporate group" under IFR 7's plain text; (2) IFR 7 could not be applied retroactively to

loans for which applications were submitted before the rule's effective date; and (3) the SBA

exceeded its statutory authority in promulgating the SCG Rule because Congress did not authorize

a maximum loan amount separate from the one set forth in the CARES Act. SBA001420–001421.

This time, the SBA chose to litigate the appeals rather than withdraw its denials.

### D.      OHA Appeal (November 2023–May 2024)

On November 29, 2023, OHA issued a Revised Notice and Order consolidating all 16

appeals, designating Utah Trailways Charter Bus Company, LLC as the lead case for purposes of

scheduling, filings, and deadlines. SBA001489–001490. On December 5, 2023, the appeal of

---

[15]  SBA001526–001527;   SBA006683–006685;   SBA002613–002614;   SBA002785–002786;
SBA004670–004671;    SBA008957–008958;    SBA010331–010332;    SBA006833–006834;
SBA007720–007721;    SBA006965–006966;    SBA006751–006752;    SBA007092–007093;
SBA007194–007195; SBA007325–007326; SBA007532–007533.
[16] *Id.*

14

15743 AMBAUM LLC was separated and dismissed after the SBA *again* withdrew that entity's denial, leaving 15 consolidated appeals. SBA001496–001497. The Agreed Administrative Record was filed on March 11, 2024. SBA022479–022480. SBA filed its response on April 5, 2024, and the record closed that same day, though the judge granted the parties additional time for supplemental briefing, with the last submission filed on April 29, 2024. SBA022496–022507; SBA022494–022495; SBA022538–022542.

OHA denied the Plaintiffs' appeals on May 6, 2024. SBA022545. On the interpretation of "common parent," OHA acknowledged that IFR 7's wording was "an unfortunate and inartful choice of words" but concluded that "common parent" could include an individual owner based on the PPP's context. SBA022560.  On retroactivity, OHA found that because IFR 7 was effective before Plaintiffs submitted their forgiveness applications, there was "no retroactivity involved." SBA022556. OHA declined to rule on whether IFR 7 exceeded the SBA's statutory authority, stating that it lacked jurisdiction to decide the validity of SBA regulations. SBA022553–022555.

### E.       *APA Litigation*

The Plaintiffs filed this APA lawsuit on June 6, 2024. The government responded on behalf of the Defendants on August 26, 2024. After the Debtor Plaintiffs commenced their bankruptcies, the Non-Debtor Plaintiffs obtained separate counsel. Jt. Status Rep. (ECF No. 29) at 2. This Motion for Summary Judgment is brought on behalf of all Plaintiffs.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In an APA case, "the district judge sits as an appellate tribunal." *Am. Biosciences, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The 'entire

case' on review is a question of law." *Id.* The "focal point" for the court's review is the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). However, the court may take judicial notice of matters of public record and consider facts deemed admitted in the pleadings. Fed. R. Evid. 201(b), Fed. R. Civ. P. 8(b)(6).

Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court must also set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

Critically, after the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 393 (2024), courts owe no deference to an agency's interpretation of the statutes it administers. Instead, a court must "exercise [its] 'independent judgment' and 'apply[ ] all relevant interpretive tools' to reach 'the best reading of a statute.'" *Env't Def. Fund v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 394–95, 400).  And when a court reviews agency action for arbitrariness, it asks whether the agency's decision was "reasonable and reasonably explained," considering "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *MCI Worldcom Network Servs., Inc. v. FCC*, 274 F.3d 542, 547 (D.C. Cir. 2001) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). A court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**ARGUMENT**

**I.    Plaintiffs Are Entitled to Loan Forgiveness Because They Were Eligible Borrowers and the Agency Identified No Basis to Deny Forgiveness on the Merits.**

Before addressing the specific legal errors in the SBA's decision, it should be understood that each Plaintiff independently satisfied every statutory criterion for both a PPP loan and loan forgiveness. The SBA's denial was not based on any deficiency in how Plaintiffs used their funds, any failure to meet the CARES Act's forgiveness requirements, or any borrower-specific ground for ineligibility. It rested entirely on the agency's interpretation and retroactive application of IFR 7's "single corporate group" rule. That rule, as applied here, cannot bear the weight the SBA places on it.

> **A.    *Each Plaintiff Satisfied the Statutory Criteria for a PPP Loan and for Loan Forgiveness.***

The CARES Act made "any business concern" eligible for a PPP loan if it met specified employee thresholds. 15 U.S.C. § 636(a)(36)(D)(i). For businesses in the accommodation and food services industry with 500 or fewer employees, the Act further waived the SBA's affiliation rules. *Id.* § 636(a)(36)(D)(iv)(I). Most Plaintiffs are restaurants and small casinos that qualified for this express statutory Affiliation Waiver. *See* SBA006713–006719; SBA001391–001397 (Affiliate Narrative Worksheet listing each entity, its NAICS code, and employee count). The remaining Plaintiffs qualified under the SBA's alternative size standard. *See* 13 C.F.R. § 121.301(b).

Every Plaintiff's individual loan amount fell well below the statutory per-borrower cap of $10 million. 15 U.S.C. § 636(a)(36)(E). The largest loan among all Plaintiffs was $1,545,851, which is barely 15 percent of this statutory maximum, and several loans were under $50,000. *See supra* Factual Background § I (loan table).

The Administrative Record for the lead case, Utah Trailways, is illustrative and representative of every Plaintiff. The SBA's own reviewer, Shirley Cole, confirmed after a thorough review that Utah Trailways was "an eligible business" and that the "borrower has no affiliated businesses/meets SBA affiliation guidelines." SBA000201. Ms. Cole reviewed the payroll documentation, calculated the maximum loan amount at $104,365, reviewed the forgiveness documentation (including payroll costs of $439,307.95 during the covered period, lease costs of $37,080, and utility costs of $3,999.44), and concluded: "Recommendation is for Approval." *Id.* The lender, Lexicon Bank, independently reached the same conclusion: its "Lender Forgiveness Amount" was $100,405.00 (the full loan amount), reflecting the lender's determination that Utah Trailways qualified for complete forgiveness. SBA000191.

The SBA overrode both of those assessments. It set the "SBA Final Forgiveness Amount" at "$0.00." SBA000191. It did so not because Utah Trailways failed any forgiveness criterion, misused its funds, or received a loan exceeding the $10 million statutory cap, but solely because the SBA concluded that Mr. Persson's entities collectively constituted a single "corporate group" exceeding $20 million. SBA000192. The same pattern of lender approval of full forgiveness, followed by SBA denial at $0.00 based exclusively on the SCG Rule applies to every Plaintiff. *See* SBA006713–006719; SBA001391–001397 (Affiliate Narrative Worksheet listing all entities and loan amounts).

## B.     *The SBA Did Not Deny Forgiveness Based on Any Forgiveness-Specific Criterion.*

The distinction between the SBA's stated basis for denial and the CARES Act's forgiveness criteria is critical. Congress set specific statutory requirements for forgiveness: a borrower must use at least 60 percent of loan proceeds for payroll costs and the remainder for qualifying expenses such as rent, utilities, and mortgage interest. 15 U.S.C. §§ 636m(b), (d)(8).

The SBA's denial letters do not allege that any Plaintiff failed to meet these requirements. Nothing in the Administrative Record suggests that the SBA identified any deficiency in Plaintiffs' use of funds, any failure to satisfy the 60 percent payroll threshold, or any other merits-based ground for denial.

Instead, the SBA's Final Loan Review Decision states that "SBA has determined that the borrower was ineligible for the PPP loan" and that the sole basis was the SCG Rule: "the Borrower business which is part of a corporate group has received more than $20,000,000 of PPP loans in the aggregate." SBA022552. That is a loan eligibility determination, not a forgiveness determination. As Judge Bates recognized in *35 State Street*, 2025 WL 870535, at *8, the criteria for loan eligibility "are separate from the criteria for loan-forgiveness eligibility." The SBA conflated the two, using a purported loan-eligibility deficiency to deny forgiveness without ever engaging with the forgiveness criteria that Congress established.

### C.    The Agency's Sole Basis for Denial Was Its Interpretation and Application of IFR 7's Single Corporate Group Rule.

The entire dispute thus reduces to a single question: whether the SBA lawfully interpreted and applied IFR 7 to treat Plaintiffs as part of one "single corporate group" that exceeded the $20 million cap. OHA acknowledged as much, framing the case as turning on "whether the single corporate group limitation in [IFR 7] is operative regarding Appellant, and a further determination of whether a single corporate group may have a 'corporate parent' that is an individual." SBA022566.

As demonstrated in the sections that follow, the SBA's interpretation and application of IFR 7 fail on every ground. The agency misinterpreted the rule's text by treating a natural person as a "common parent" of a "corporate group" (Count I). It applied the rule retroactively to loan applications submitted before the rule existed, in violation of the rule's own terms, the agency's

19

own guidance, and the limits of its statutory authority (Counts II and III). And it exceeded its statutory authority by using the SCG Rule to deny forgiveness without a reasoned explanation connecting a cap exceedance to forgiveness ineligibility (Count IV). Each of these errors independently requires vacatur.

## II.    The SBA's Interpretation of IFR 7 Is Arbitrary, Capricious, and Contrary to Law (Count I).

The SBA's denial of loan forgiveness rests on an interpretive error: the agency's treatment of an individual owner, Eric Persson, as a "common parent" for purposes of the IFR 7 "single corporate group" limitation. This interpretation is contrary to the ordinary meaning of "common parent," as that term is consistently used throughout federal law and beyond, is contradicted by the regulation's own structure, is unsupported by the Administrative Record, and is the product of arbitrary and shifting agency reasoning. It cannot be sustained under the APA and applicable principles of regulatory interpretation.

### A.    The Plain Meaning of "Common Parent" Forecloses the SBA's Interpretation.

When a court interprets an agency regulation, it begins with the text itself, applying "traditional tools of statutory interpretation: text, context, structure, and purpose." *Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 479 (D.C. Cir. 2023) (citing *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 735, 738 (2022)); *see also Kisor v. Wilkie*, 588 U.S. 558, 573 (2019) (courts apply "all the standard tools of interpretation" to determine whether a regulation is "genuinely ambiguous"). It is also "fixed law that words of statutes or regulations must be given their 'ordinary, contemporary, common meaning.'" *FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009) (citing *Williams v. Taylor*, 529 U.S. 420, 431 (2000)).

IFR 7 applies to businesses that are part of a "single corporate group," defined as businesses that "are majority owned, directly or indirectly, by a common parent." 85 Fed. Reg. at 26,325. The

terms "corporate group" and "common parent" have settled, "common," meanings in federal law. *See Taylor*, 529 U.S. at 431. Across federal statutes, regulations, and case law, these terms consistently describe relationships among entities within a corporate structure, not natural persons who merely hold ownership interests in multiple businesses.

The Internal Revenue Code ("**IRC**") uses "common parent" to describe or identify corporations, rather than individuals. For example, the IRC example, defines a "parent-subsidiary controlled group" as "chains of corporations connected through stock ownership with a common parent corporation," but uses different language for corporations owned by "individuals, estates, or trusts." 26 U.S.C. §§ 1563(a)(1)–(2) ; *see also id.* §§ 59(k)(2)(B)(iii) (using "common parent" solely to refer to or describe a corporation), 243(b)(3)(C) (same), 409(l)(4) (same), 542(b) (same), 843 (same), 864 (same), 7701(a)(33)(H) (same).   In contrast, the IRC uses language such as "common owner" or "principal stockholder" to refer to or describe individuals in otherwise-similar circumstances. *Id.* §§ 1563(c)(2)(A),(B). Congress's use of different language for corporations and individuals owning corporations demonstrates that "common parent" is not a label applicable to individuals owning corporate groups. Similarly, federal procurement regulations expressly define a "common parent" as a "corporate entity that owns or controls an affiliated group of corporations." 48 C.F.R. § 4.901. And the Supreme Court has treated a "parent" in the corporate context as a relationship between entities: "so-called because of control through ownership of another corporation's stock." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).

Moreover, the term "common parent" is simply not used to describe the relationship between a natural person and his or her businesses. As noted above, despite millions of articles about Elon Musk and his various businesses, none seem to describe Mr. Musk as the "common parent" of such businesses. An individual who owns multiple companies may be described as a

21

founder, controlling shareholder, principal stockholder, or common owner. But it would be far outside any common usage or plain meaning to describe that person as the "common parent" of those companies.

Mr. Persson is not a business structure or entity; he is a natural person who holds direct or indirect ownership interests in multiple legal entities. The consistent usage of "common parent" across federal laws and in common parlance to refer exclusively to an entity within a corporate structure, not an individual owner, demonstrates that this term is not ambiguous and has a plain meaning. Because the plain meaning of the SCG Rule does not allow for the denial of loan forgiveness of the Plaintiffs, summary judgment in favor of the Plaintiffs on Count I is warranted.

### B.    OHA's Contrary Reasoning Fails.

To the extent that "common parent" has any ambiguity in the context of loans to businesses for payroll expenses, the OHA's reasoning for including individuals in such terms is meritless and must be rejected. OHA concluded that the term "common parent" must include individuals because the PPP allowed sole proprietorships and partnerships to participate. SBA022559. That reasoning conflates two distinct questions: 1) who may borrow under the PPP and 2) how a "corporate group" is determined. The fact that sole proprietorships or partnerships may receive PPP loans says nothing about whether an individual person can be a "common parent" of a "corporate group" under IFR 7.

OHA also reasoned that if the SBA had intended to limit the rule to corporations, it would have said "corporate parent" rather than "common parent." SBA022559. But the regulation already defines the relevant universe as a "single corporate group." Within that context, "parent" carries its ordinary corporate meaning. The SBA did not need to use the redundant phrase "corporate

22

parent" to preserve that meaning any more than the IRC needs to say "corporate parent corporation" to convey the concept.

Tellingly, OHA acknowledged that the phrase "single corporate group" was "an unfortunate and inartful choice of words." SBA022560. OHA then reinterpreted IFR 7 so that the rule would read, in effect: "businesses are part of a single business concern group if they are majority owned, directly or indirectly, by a common owner." *Id.* (marks in original). But that is not what the rule says. OHA cannot rewrite IFR 7 under the guise of interpretation. *See Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 676 (D.C. Cir. 2003) (internal quotations and citation omitted) ("[T]o prevent agencies from circumventing the notice-and-comment process by rewriting regulations under the guise of interpreting them, we will reject an agency interpretation that is plainly erroneous or inconsistent with the regulation.").

### C.    The Structure of IFR 7 Confirms That the SBA's Interpretation Is Incorrect.

IFR 7 expressly distinguishes between affiliation-based concepts and the "single corporate group" limitation. The Rule states that "[b]usinesses are subject to this limitation even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act or are otherwise not considered to be affiliates under SBA's affiliation rules." 85 Fed. Reg. at 26,325. In other words, IFR 7 establishes a separate limitation that does not turn on affiliation, common control, or general ownership.

The SBA's interpretation collapses that distinction. By treating an individual's majority ownership as sufficient to create a "single corporate group," the SBA has effectively converted the SCG Rule into an ownership-based affiliation test, which is precisely the sort of limitation that the rule distinguishes itself from. If "common parent" meant nothing more than "common owner," the regulation's separate discussion of affiliation, and its explicit statement that the SCG Rule applies

23

independently of the affiliation rules would serve no purpose, which is against construction and interpretation principles. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (the Court is "reluctant to treat statutory terms as surplusage in any setting") (internal quotations and citation omitted).

The Administrative Record confirms that the SBA did not apply IFR 7 as written. Instead, the agency imported broader ownership and control concepts drawn from the affiliation rules to reach a predetermined result.

The "Affiliate Narrative Worksheet" in the Administrative Record, which is the core analytical document the SBA used to evaluate Plaintiffs, is titled "Affiliation Family: Persson Family et al." SBA006713–006719; *see also* SBA001391–001397. The Worksheet states: "Eric Persson is a family of 40 affiliated entities, all of which received Paycheck Protection Program ("PPP") loans. These loans are affiliated because Eric Persson owns anywhere from 57% to 100% of these entities. Thus, these entities are considered affiliates of each other based on the common, majority ownership by Mr. Persson." *Id.*

An agency cannot enforce a regulation by substituting a different standard for the one it adopted. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *see also Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (in reviewing agency action, "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record"). The SBA's decision here was based on affiliation concepts that do not appear in IFR 7. That alone requires vacatur under the APA.

### D.    *The SBA's Shifting Reasoning Is Itself Arbitrary and Capricious.*

Even if the regulation were ambiguous, which it is not, the SBA's interpretation would still fail under the arbitrary and capricious standard because the agency's reasoning has been

24

inconsistent and shifting. Across three rounds of forgiveness denials, the SBA variously described Mr. Persson as: an "individual"; an "individual or estate"; a "family"; a "common parent"; and ultimately, a "common owner."[17] None of these formulations, except "common parent" (used in only the second round), appears in IFR 7. None is tied to a consistent, reasoned explanation grounded in the regulation's text.

An interpretation that shifts over time and departs from the regulatory language does not reflect the agency's fair and considered judgment. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.") (internal quotations and citation omitted); *see also Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 212 F.3d 1301, 1304–05 (D.C. Cir. 2000) (declining to defer to an agency interpretation when it "flip-flop[ed]" and adopted a different interpretation of the regulation or contradicted its position on appeal).

### E.    The SBA's Interpretation Must Be Set Aside.

In sum, the SBA's interpretation of IFR 7 is contrary to its plain meaning, disregards its structure, collapses distinct regulatory concepts, relies on affiliation standards rather than the adopted "corporate group" standard, and rests on inconsistent and unsupported reasoning. The final decision is contrary to law, arbitrary and capricious, and must be set aside.

---

[17] SBA007754–007755;  SBA008959–00008960;  SBA006685–006686;  SBA012565–012566; SBA013182–013183;    SBA007196–007197;    SBA007094–007095;    SBA007534–007535; SBA010333–010334;    SBA013580–013581;    SBA013666–013667;    SBA014170–014171; SBA014711–014712;    SBA014809–014810;    SBA002631–002632;    SBA002787–002788; SBA004672–004673; SBA006754–006755; SBA002471–002472; SBA006969–006970.

**III.    The SBA's Retroactive Application of IFR 7 Was Unlawful (Counts II and III).**

    **A.    *IFR 7 Imposed a New Limitation That Did Not Exist When Plaintiffs Applied For the Loans.***

The relevant timeline is undisputed. Every Plaintiff submitted its PPP loan application before May 4, 2020. IFR 7 was published on May 4, 2020. 85 Fed. Reg. 26,324. Before that date, no aggregate cap across commonly owned businesses existed. The governing framework imposed only a per-borrower cap of up to $10 million. *See* 15 U.S.C. § 636(a)(36)(E); 85 Fed. Reg. at 20,812. Moreover, all the Non-Debtor Plaintiffs, and the Debtor Plaintiffs operating casino-hotels, were entitled to the Affiliation Waiver.

IFR 7 changed that framework by introducing the $20 million aggregate cap across a "single corporate group." 85 Fed. Reg. at 26,325. The SBA then applied that limitation to deny Plaintiffs' eligibility and forgiveness.

Even if the SBA properly implemented and interpreted the SCG Rule to deny loan forgiveness with respect to any loans applied for or disbursed after May 4, 2020, all the loans of the Plaintiffs (and any of their affiliates) would still be eligible for forgiveness but for the SBA's retroactive application of the SCG Rule. Specifically, only $ 1,067,879of PPP loans were disbursed to the Plaintiffs or their affiliates on or after May 4, 2020 (inclusive of $174,783 to the Non-Debtor Plaintiffs). This is vastly lower than the $20 million cap under IFR 7.  To find violation of its SCG Rule and deny forgiveness for all the PPP loans, the SBA had to apply that rule not only to loans disbursed on or after May 4, 2020, but also to loans that had been fully disbursed before that date.

That is retroactivity in substance. "Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). A rule is retroactive when it "attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70 (1994). That is precisely what occurred here: Plaintiffs' loan applications were

submitted under one legal regime, and the SBA later judged those applications under a different one.

**B.      The SBA Lacked Authority to Apply IFR 7 Retroactively, and Its Application Has an Impermissible Retroactive Effect.**

The Supreme Court has made clear that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen*, 488 U.S. at 208. Even where an agency can articulate substantial policy reasons for retroactivity, "courts should be reluctant to find such authority absent an express statutory grant." *Id.* at 208–09. *In Landgraf v. USI Film Products*, the Supreme Court established a two-step framework for determining whether a new legal rule could be applied retroactively to past events. First, a court should look to whether Congress expressly provided that the statute be applied retroactively. 511 U.S. at 270. If "the statute contains no such express command," a court moves on to the second step, which examines whether the law has a "retroactive effect." *Id.* at 280. This analysis looks at "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 270. A regulation is impermissibly retroactive if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Id.* at 269 (citation omitted).

The first *Landgraf* step is simple. There is no such express grant in the CARES Act that allows the SBA to promulgate retroactive rules for the PPP. Section 9012 of the CARES Act directed SBA to "issue regulations to carry out" the PPP. 15 U.S.C. § 9012. That is a general grant of prospective rulemaking authority. It does not mention retroactivity, let alone provide the clear congressional authorization "in express terms" that *Bowen* requires. *Bowen*, 488 U.S. at 208. The

27

SBA's general authority under 15 U.S.C. § 634(b)(6) to "make such rules and regulations as [it] deems necessary" is likewise insufficient. General rulemaking authority is not the "power to promulgate retroactive regulations." *Bowen*, 488 U.S. at 208, 213. Indeed, the Supreme Court in *Bowen* found that despite being given general rulemaking power by Congress, the U.S. Department of Human Health & Human Services "ha[d] no authority to promulgate retroactive cost-limit rules" because the Medicare Act "contain[ed] no express authorization of retroactive rulemaking." *Id.* at 213–14.

As to the second *Landgraf* step, applying IFR 7 to Plaintiffs' loans produces an impermissible retroactive effect because it attaches new legal consequences to events completed before the rule existed. *Landgraf*, 511 U.S. at 269–70. The relevant past events here are Plaintiffs' loan applications under the pre–IFR 7 period. Before May 4, 2020, the PPP contained only a per-borrower cap tied to payroll and a hard maximum of $10 million. There was no aggregate "single corporate group" cap. 15 U.S.C. § 636(a)(36)(E). Plaintiffs submitted their applications, were approved by their lenders, and received disbursements in reliance on that framework. After IFR 7, SBA revisited those already-consummated transactions and based solely on the newly announced corporate group cap, declared Plaintiffs "ineligible" and denied forgiveness. That sequence does exactly what *Landgraf* forbids. It "creates a new obligation" to repay principal and interest that did not previously exist for these borrowers, and "attaches a new disability" (forgiveness ineligibility) to conduct that was lawful when undertaken. *Landgraf*, 511 U.S. at 269–70; *see also Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999) ("Applying the rule's specific interpretation to impose liability based on pre-rule acts therefore gives it retroactive effect which OSM can do only if authority therefor is conveyed by Congress in express terms . . . .

28

Because section 510(c) contains no express terms authorizing retroactive liability, we hold that the IFR is invalid." (cleaned up)).

SBA's effort to recast its action as a forward-looking forgiveness determination does not avoid the retroactive effect. Under *Landgraf*, the question is not the procedural posture of the agency decision, but whether the new rule is being used to impose "new legal consequences" on prior events. 511 U.S. at 269–70. Here, the agency did not deny forgiveness because Plaintiffs failed to satisfy the CARES Act's forgiveness criteria based on post-loan conduct, but rather denied forgiveness because, in SBA's view, Plaintiffs "were ineligible for the PPP loans" from the beginning, under a cap that did not exist when they applied. SBA001395; SBA001399-SBA001400. That is a backward-looking eligibility determination that changes the legal status of completed loan applications and strips Plaintiffs of forgiveness they would have been eligible to receive under the pre–IFR 7 regime. The fact that some disbursements or forgiveness applications post-dated May 4 does not cure the retroactivity problem, because the "relevant past event" is the loan application under then-governing rules, not the later administrative step at which the agency chose to announce the consequence.

Two additional features underscore the impermissible retroactive effect. First, IFR 7 itself draws a prospective line by declaring immediate effectiveness only "with respect to any loan that has not yet been fully disbursed as of April 30, 2020," while simultaneously disclaiming retroactivity, 85 Fed. Reg. at 26,325–26, confirming that the rule was intended to govern prospective disbursements rather than to rewrite the legal consequences of already submitted and approved applications. Second, SBA repeatedly instructed applicants that eligibility determinations would be made under the "laws, rules, and guidance available at the time of the borrower's loan application," further reinforcing the settled expectations that *Landgraf* protects

29

against retroactive disruption. *See, e.g.*, 85 Fed. Reg. at 33,005; 86 Fed. Reg. at 8,288. Applying IFR 7 to declare past loans ineligible and to deny forgiveness on that basis therefore fails *Landgraf*'s second step as well.

The PPP was designed to provide rapid financial assistance during an economic emergency, relying on borrower certifications, lender participation, and expedited approval processes. *See* 85 Fed. Reg. at 20,811–12. That design depends on the ability of borrowers and lenders to rely on the rules in effect at the time of the loan application. Businesses like Plaintiffs that took out PPP loans did so by making a business decision highly based on the potential forgiveness of those loans—a basis they relied on at the time of their application. Plaintiffs did not make such a business decision thinking they were gambling on an uncertain benefit of forgiveness dependent on the agency's arbitrary rule changes. If the SBA can retroactively alter eligibility standards, borrowers cannot rely on the governing rules when they apply, and lenders cannot evaluate eligibility under a stable legal framework.

Congress's decision to waive notice-and-comment rulemaking for PPP regulations, *see* 15 U.S.C. § 9012, further underscores the importance of a clear temporal line. The D.C. Circuit has recognized that what would otherwise be retroactive agency action can be rendered "functionally prospective" where the agency places "the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision." *Pub. Utils. Comm'n of Cal. v. FERC*, 988 F.2d 154, 164 (D.C. Cir. 1993) (internal quotations and citation omitted). But where, as here, the agency could issue binding rules without any prior notice at all, the risk of retroactive effect is heightened. That is because the affected parties have no opportunity to anticipate, object to, or conform their conduct to rules that do not yet exist. Far from receiving provisional notice, Plaintiffs were affirmatively told they could "rely on the laws, rules, and guidance available at the

30

time of the relevant application." *See* SBA000093 (quoting FAQ 17). The SBA cannot now use a rule that post-dates Plaintiffs' applications to rewrite the legal consequences of Plaintiffs' completed transactions. Because the CARES Act does not authorize retroactive rulemaking, and because the SBA's denial depends on applying IFR 7 to loan applications submitted before the rule existed, the decision is "in excess of statutory jurisdiction, authority, or limitations" and must be set aside. 5 U.S.C. § 706(2)(C).

### C.    IFR 7's Own Terms Prohibit Retroactive Application.

IFR 7 itself expressly provides that it has "no preemptive or retroactive effect." 85 Fed. Reg. at 26,326. OHA relied on separate language in IFR 7 stating that the Rule is "immediately effective with respect to any loan that has not yet been fully disbursed as of April 30, 2020." *Id.* at 26,325. But that language governs the administration of ongoing loan disbursements. It does not purport to apply new eligibility limitations to loan applications already submitted.

Said another way, these provisions are not in conflict. They address different issues. The "no preemptive or retroactive effect" clause governs the legal consequences of past conduct, meaning, whether borrowers were eligible at the time they applied for PPP loans. That provision makes clear that IFR 7 does not alter eligibility determinations made under the rules in effect when those applications were submitted.

By contrast, the disbursement language governs the administration of loan funds going forward. It allows the SBA and lenders to apply IFR 7 to future disbursements, such as declining to release additional funds that would cause a properly-defined corporate group to exceed the $20 million cap.

What the Rule does not do is use that forward-looking disbursement provision to revisit and invalidate prior eligibility determinations. But the SBA's decision here does exactly that. The SBA did not look at how remaining funds were to be disbursed but rather concluded that Plaintiffs

31

were never eligible in the first place because their applications violated a limitation announced after those applications were submitted.

Reading the disbursement provision to override the "no retroactive effect" provision would violate a basic rule of construction: every provision should be given effect. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (courts should avoid interpretations that render provisions "insignificant" or "superfluous"). The proper reading is straightforward. IFR 7 applies prospectively to the distribution of funds, but it does not retroactively alter the legal standards governing loan eligibility at the time of application. Because the SBA applied IFR 7 to do exactly that, its decision is unlawful.

### D.    *OHA's Attempts to Avoid the Retroactivity Problem Fail.*

OHA attempted to avoid the retroactivity problem by asserting that the "relevant application" is not the loan application but rather the forgiveness application, which was submitted after IFR 7's effective date. SBA022556. That reasoning fails because it conflates two distinct legal inquiries: eligibility for the loan and eligibility for forgiveness.

The SBA did not deny forgiveness based on how Plaintiffs used their PPP funds. Instead, the SBA concluded that Plaintiffs "were ineligible for the PPP loans" in the first place. SBA000198. That is a loan eligibility determination, and it must be governed by the rules in effect at the time of the loan application, as the SBA's own guidance provides. *See* 85 Fed. Reg. at 33,005; *see also* 86 Fed. Reg. at 8,288; 85 Fed. Reg. at 38,306.

OHA's reasoning would allow the SBA to apply new rules retroactively simply by enforcing them at the forgiveness stage. Under that logic, the SBA could adopt any new eligibility limitation after the fact and then use the forgiveness process to retroactively invalidate loans that

32

were lawfully obtained. That approach cannot be reconciled with basic retroactivity principles. *See Bowen*, 488 U.S. at 208; *Landgraf*, 511 U.S. at 269–70.[18]

An agency acts arbitrarily when it ignores its own stated standards, fails to consider obvious reliance interests, or adopts a position inconsistent with its prior guidance without explanation. *See State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem."); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) ("a reasoned explanation is needed [from the agency] for disregarding facts and circumstances that underlay or were engendered by the prior policy"); *Encino Motorcars*, 579 U.S. at 221–22 ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (internal quotations and citation omitted). The SBA did all three here. It ignored IFR 7's own clause that says it would not have a retroactive effect. *See* 85 Fed. Reg. at 26,326. The SBA ignored its own repeated guidance that loan forgiveness eligibility is judged under the rules in effect at the time of the loan application. *See* 85 Fed. Reg. at 33,005; *see also* 86 Fed. Reg. at 8,288; 85 Fed. Reg. at 38,306. And the SBA ignored the reliance interests of borrowers who were told they could rely on the laws and guidance available at the time of their application. These failures are precisely the types of deficiencies that render agency action arbitrary and capricious under the APA. *See Encino Motorcars*, 579 U.S. at 221–22.

---

[18] OHA and SBA seemed to suggest that Plaintiffs should have been on "notice" of the limitation because IFR 7 was published before their loans were fully disbursed. SBA022555. Retroactivity, however, does not depend on whether a party anticipated a future rule. It depends on whether the agency is applying a rule to completed conduct. *Landgraf*, 511 U.S. at 269–70. Informal awareness of pending rulemaking cannot substitute for binding legal obligations. Moreover, Plaintiffs had already submitted their loan applications before IFR 7 existed. The fact that some disbursements occurred shortly after publication does not convert a retroactive application into a prospective one.

Even if the Court were to treat IFR 7 as prospective with respect to not-yet-disbursed loans, the result is the same for those Plaintiffs whose loans were disbursed on May 4–5, 2020—within twenty-four hours of the Rule's Federal Register publication. 85 Fed. Reg. 26,324. The Administrative Record shows that Plaintiff Utah Trailways was disbursed on May 5, 2020 SBA001399, and that Plaintiffs TROPICALSMOOTHIEAZ2, TROPICALSMOOTHIEAZ3, and VERITASFAYTHE INC. were disbursed on May 4, 2020. SBA001399; SBA001400. Expecting small businesses and community lenders to identify "single corporate groups" amid emergency-volume PPP processing, aggregate total PPP borrowing across those groups, and withdraw or cancel loans in a single day is not meaningful notice. *See Pub. Utils. Comm'n of Cal.*, 988 F.2d at 164 (explaining that agency action is "functionally prospective" only when the affected parties are placed on clear advance notice that terms are provisional and subject to later revision). The fact that twenty-four hours is not reasonable notice is reinforced by SBA's own reliance-inducing guidance, which states that eligibility will be judged as of the loan application and provides an assurance that "Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application," and by IFR 7's express "no preemptive or retroactive effect" clause. 85 Fed. Reg. at 26,326; SBA000093 (FAQ 17); 85 Fed. Reg. at 33,005; 86 Fed. Reg. at 8,288. The agency neither acknowledged nor reasonably addressed those reliance interests before denying forgiveness. *See Encino Motorcars*, 579 U.S. at 222 (holding that agencies must consider "serious reliance interests" when changing policy and provide a reasoned explanation for disregarding them); *Fox Television Stations, Inc.*, 556 U.S. at 515–16 (requiring a "reasoned explanation" for policy change, particularly where the prior policy engendered reliance).

34

**IV.    IFR 7 Exceeds the SBA's Statutory Authority and Is Contrary to Law (Count IV).**

The SBA's reliance on IFR 7 to deny Plaintiffs' forgiveness provides an independent basis to set aside the agency's decision. The CARES Act established a detailed, borrower-focused framework governing PPP eligibility, loan amounts, and forgiveness. IFR 7 departs from that framework by imposing an aggregate limitation that finds no footing in the statute and that the SBA has applied in a manner untethered to the statutory scheme, the regulation's own text, and basic principles of reasoned decisionmaking. Whatever administrative discretion the SBA may possess to manage PPP funds, it does not extend to rewriting the statutory architecture Congress enacted.

### A.    The CARES Act Establishes a Borrower-Based Framework that Limits the SBA's Discretion.

Congress designed the PPP around the individual borrower. The statute defines eligibility for PPP loans at the borrower level: "any business concern" is eligible if it meets specified employee thresholds. 15 U.S.C. § 636(a)(36)(D)(i). It requires certifications specific to the individual borrower. *Id.* § 636(a)(36)(G). And the statute ties the maximum loan amount to each borrower's own payroll costs, capped at $10 million per borrower. *Id.* § 636(a)(36)(E). On the back end of the process under the CARES Act, forgiveness of those loans likewise turns on the individual borrower's use of funds, making a "covered loan" eligible for forgiveness based on the borrower's expenditures on payroll, among other things, during the covered period. *Id.* § 636m(b). Congress did not adopt a group-based allocation regime or authorize the SBA to aggregate separate borrowers' loans and impose a combined cap across them.

Where Congress intended to address ownership relationships, it did so expressly. The CARES Act's Affiliation Waiver exempts businesses in the accommodation and food services industry from the SBA's affiliation rules for purposes of PPP eligibility. *Id.* § 636(a)(36)(D)(iv).

That targeted provision reflects a considered legislative judgment about how ownership structures should (and should not) affect a borrower's access to PPP funds. An agency "may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002)).  The SBA's imposition of IFR 7's aggregate cap on borrowers who independently satisfy the statute's eligibility and loan-amount requirements does exactly that.

IFR 7 introduces a rule providing that businesses deemed part of a "single corporate group," which is defined as businesses "majority owned, directly or indirectly, by a common parent," may not receive more than $20 million in PPP loans in the aggregate. 85 Fed. Reg. at 26,325. That limitation does not appear in the CARES Act, is not tied to any statutory provision, and operates on a group-based theory (rather than looking at the individual borrower) that Congress did not adopt. As applied here, the SBA used IFR 7 to deny forgiveness to Plaintiffs who are borrowers who satisfied every statutory eligibility criterion, whose individual loan amounts fell well below the $10 million per-borrower cap, and who used their funds for their intended purpose. *See supra* at 19. The denial letters stated that "SBA has determined that the borrower was ineligible for the PPP loan" and that the sole basis was the SCG Rule. *Id.* Nothing in the record suggests that the SBA identified any deficiency in Plaintiffs' use of funds, any failure to meet the CARES Act's forgiveness criteria under 15 U.S.C. § 636m, or any grounds for denial. SBA022552; SBA022555–022556.

In *Loper Bright*, 603 U.S. at 392, the Supreme Court affirmed that courts must exercise independent judgment in determining whether an agency has acted within its statutory authority and that agencies may not claim deference for regulatory expansions that lack grounding in the

36

statute. An agency may not impose a regulatory limitation that effectively displaces the statutory framework Congress enacted. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

### B.       *Even Where Courts Have Upheld the SBA's Authority to Adopt a Corporate-Group Cap, They Require Lawful Application of that Rule.*

The SBA may contend that courts have upheld its authority to adopt a corporate group limitation.  *See 35 State Street*, 2025 WL 870535. But even assuming that decision is correct, it does not support the SBA's position here.

In *35 State Street*, the court treated the "single corporate group" rule as a limitation on loan amounts and did not invalidate it as ultra vires. But, critically, the court did not hold that the SBA may apply that rule in any manner it chooses. To the contrary, it vacated the agency's decision as arbitrary and capricious because the SBA failed to explain how a violation of that limitation justified a denial of forgiveness.

That principle is decisive here. Even where the SBA is permitted to adopt a corporate group cap, it must still apply that rule in a manner consistent with the statute, the regulation's text, and basic principles of reasoned decisionmaking. The agency cannot rely on the existence of the rule to excuse its unlawful application.

Separately, even if a corporate-group cap were permissible in the abstract and the SBA's interpretation and application of IFR 7 is otherwise correct, the SBA's selection of a $20 million threshold is arbitrary and capricious. The agency did not "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (1983) (internal quotations and citation omitted). IFR 7 states only that the cap was adopted "[t]o preserve the limited resources available to the PPP program," 85 Fed. Reg.

37

at 26,324–25, and then announces without analysis that "businesses that are part of a single corporate group shall in no event receive more than $20,000,000 of PPP loans in the aggregate." *Id*. at 26,325. The rule contains no discussion of how $20 million (as opposed to any other figure) advances the stated objective, no evaluation of the distribution of PPP loans across multi-entity ownership structures, no estimate of affected borrowers, and no consideration of alternatives. *See id*. at 26,324–26.

The Administrative Record is equally silent about the choice of $20 million. It shows the agency applying the figure as a bright line, but nowhere does it explain why $20 million was a reasoned decision. *See, e.g.*, SBA001390–001404 (Affiliate Narrative Worksheet applying the "corporate group" cap without providing any contemporaneous rationale for the threshold); SBA001396 (asserting, without analysis, that "affiliation equates to a corporate group" and then concluding "[t]he parent in these cases is Eric Persson"). Selecting a number that determines legal consequences for borrowers, particularly when used at the forgiveness stage to extinguish relief Congress authorized at the borrower level, required "reasoned decisionmaking." *State Farm*, 463 U.S. at 52–53. None existed here.

The arbitrariness of the $20 million limit is evidenced by the *billions* of PPP funds that were appropriated but not disbursed to borrowers. As noted above, Congress rescinded $146.5 billion of unused PPP funds in December 2020. Accordingly, IFR 7 proved unnecessary. It may even have been counterproductive, as the SCG Rule may have prevented otherwise-eligible borrowers from applying for PPP loans during that time. Denying loan forgiveness to the Plaintiffs years later, when it was indisputable that the PPP funds had not been exhausted, so the SCG Rule had no benefit and any violation thereof was moot, is arbitrary and capricious.

### C.    *The SBA's Application of IFR 7 Here Exceeds Any Permissible Authority.*

The SBA's decision rests on an impermissible application of IFR 7 that exceeds any authority the agency may possess. As explained above, Plaintiffs' entities are organized into multiple distinct corporate groups, each with its own parent entity. None of those groups exceeds the $20 million cap. The SBA reached a contrary conclusion only by collapsing those separate corporate groups into a single group based on a shared individual owner or investor, Mr. Persson, and treating him as a "common parent" or "common owner."[19]

That approach is not grounded in the statutory scheme, corporate law principles, or even the text of IFR 7. It replaces a corporate structure-based concept with a generalized ownership test and thereby expands the scope of the rule beyond its lawful bounds.

Even if the SBA has discretion to impose a cap across a properly defined corporate group, it does not have discretion to redefine what constitutes such a group in a manner untethered to law. The authority to administer a rule does not include the authority to rewrite its operative terms.

## V.    Plaintiffs Are Entitled to Declaratory and Injunctive Relief (Count V).

The APA directs reviewing courts to "hold unlawful and set aside agency action" that is arbitrary, capricious, contrary to law, or in excess of statutory authority. 5 U.S.C. §§ 706(2)(A), (C). Where, as here, agency action fails on multiple independent grounds, vacatur is the ordinary remedy. *See AARP v. EEOC*, 292 F. Supp. 3d 238, 242 (D.D.C. 2017) ("[T]he [APA] contemplates vacatur as the usual remedy"); *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier*

---

[19]    SBA001431–001432; SBA010331–010332; SBA007194–007195; SBA007325–007326; SBA007720–007721; SBA008957–008958; SBA001436–001437; SBA001526–001527; SBA002785–002786; SBA004670–004671; SBA006683–006684; SBA006833–006834; SBA002613–002614; SBA006965–006966; SBA007092–007093; SBA006751–006752.

*Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (citation omitted) ("unsupported agency action normally warrants vacatur").

There is no "reason to depart from that standard course of action" here. *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 179 (D.C. Cir. 2022) (citation omitted). Because the statute "umambiguous[ly]" forecloses the SBA from applying the SCG Rule to the Plaintiffs, there is no way the agency could "rehabilitate" its decision "on remand." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022). Nor would vacatur be "disruptive" to the agency or third parties, *id.*—it would simply mean that Plaintiffs receive the loan forgiveness to which they are entitled.

The Court should also enter a declaratory judgment that the SBA violated the statute when it denied forgiveness of Plaintiffs' loans, and that Plaintiffs are entitled to full forgiveness of those loans. The Court should further declare that Plaintiffs are not required to make any repayments on those loans. The Declaratory Judgment Act empowers this Court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights . . . of any interested party . . . whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). This case presents an actual controversy within the Court's jurisdiction, and Plaintiffs have an interest in full forgiveness of their PPP loans.

A declaratory judgment would "serve a useful purpose in clarifying the legal relations in issue" and would "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to th[is] proceeding." *Tierney v. Schweiker*, 718 F.2d 449, 456 (D.C. Cir. 1983) (citation omitted). Despite being entitled to loan forgiveness, *see supra* at 17, Plaintiffs faced a long, drawn-out process that culminated in denial of forgiveness. Along the way, the SBA's decisionmaking took several twists and turns, and the agency treated Plaintiffs differently from materially identical applicants. A declaratory judgment is warranted to "put an end" to the

40

significant "uncertainty and insecurity" that Plaintiffs have experienced for all these years. *Tierney*, 718 F.2d at 456. It would also "ensur[e] that the [SBA] cannot engage in similar" unlawful conduct toward Plaintiffs "or anyone else in the future." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1366–67 (D.C. Cir. 2023).

In addition, the Court should enjoin the SBA from requiring Plaintiffs to make repayments of the loans. This relief will prevent any further irreparable harm to Plaintiffs from the SBA's unlawful conduct, and will serve the public interest by effectuating Congress's statutory scheme.

## VI.     The APA Waives Sovereign Immunity for Plaintiffs' Claims.

Defendants assert that sovereign immunity bars a portion of Plaintiffs' requested relief. Answer ¶ 31. That defense fails as a matter of law. The APA expressly waives sovereign immunity for actions seeking relief other than money damages against federal agencies and officials acting in their official capacity. 5 U.S.C. § 702. The statute provides that "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review" and that such actions "shall not be dismissed nor relief therein be denied on the ground that it is against the United States." *Id.*

The Supreme Court and the D.C. Circuit have consistently recognized that § 702 waives sovereign immunity for suits seeking equitable relief under the APA, including claims for vacatur of agency action. *See Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988); *Trudeau v. FTC*, 456 F.3d 178, 186 n.11 (D.C. Cir. 2006) (internal quotations and citation omitted) (explaining that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not"). Plaintiffs seek precisely that form of relief: vacatur of unlawful agency action, a declaration of Plaintiffs' rights, and an injunction preventing the SBA from continuing to enforce its erroneous interpretation. Such relief falls squarely within § 702's waiver. Sovereign immunity does not bar Plaintiffs' claims.

41

**CONCLUSION**

The Court should enter summary judgment for Plaintiffs and vacate the SBA's decision denying forgiveness of Plaintiffs' PPP loans. The Court should also enter a declaration that the denial violated the statute, that Plaintiffs are entitled to full forgiveness of their loans, and that Plaintiffs are not required to make repayments on those loans. In addition, the Court should enjoin the SBA from requiring Plaintiffs to make any repayments on their PPP loans, and should award Plaintiffs their reasonable attorneys' fees and costs to the extent permitted by law and grant such other relief as the Court deems just and proper.

Dated: April 3, 2026

Respectfully submitted,

By: */s/ Brandi G. Howard*
Brandi G. Howard (DC Bar No. 156135)
McGuireWoods
888 16th Street
N.W. Suite 500
Washington, D.C. 20006
T: (202) 857-2468
F: (202) 828-3338
bhoward@mcquirewoods.com

- and -

Hamid R. Rafatjoo (admitted *pro hac vice*)
Raines Feldman Littrell LLP
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Tel: (310) 440-4100
hrafatjoo@raineslaw.com

42

- and -

David S. Forsh (admitted *pro hac vice*)
Raines Feldman Littrell LLP
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019
Tel: (917) 790-7100
dforsh@raineslaw.com

 *Attorney for Non-Debtor Plaintiffs*


/s/ *Kyle R. Jefcoat*
Kyle R. Jefcoat (Bar No. 492380)
Dean W. Baxtresser (Bar No. 1012089)
Genevieve P. Hoffman (Bar No. 155092)
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
kyle.jefcoat@lw.com
dean.baxtresser@lw.com
genevieve.hoffman@lw.com

 *Attorneys for Debtor Plaintiffs*

43

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 3, 2026, I caused the foregoing to be electronically filed using the CM/ECF system, which will send notice of this filing to all counsel of record.

<div align="center" style="margin-left:40%">

*/s/ Brandi G. Howard*
Brandi G. Howard

</div>

<div align="center">44</div>